### ADELL BROADCASTING CORP., Plaintiff,

v.

### CABLEVISION INDUSTRIES, and Raymond P. Clark, jointly and severally, Defendants.

### No. 93–CV–72727–DT.

United States District Court, E.D. Michigan, Southern Division.

June 6, 1994.

**1282**

Michael J. Smith, Neil J. Lehto, Sterling Heights, MI, for plaintiff.

Thomas J. Tallerico, William G. Asimakis, Jr., Bloomfield Hills, MI, for defendants.

## OPINION AND ORDER

ROSEN, District Judge.

On June 8, 1993, Plaintiff filed a six-count complaint against Defendants in Macomb County, Michigan, Circuit Court. Count I of the complaint alleges a breach of 47 C.F.R. §§ 76.51–76.70, which are FCC regulations requiring carriage of, *inter alia*, local commercial television stations by cable television services. Count II asks for specific performance of these regulatory carriage requirements. Count III alleges Defendants were negligent in not complying with these mandates. Count IV asserts that Defendants violated a contract entered into by the parties on February 20, 1991. Count V alleges misrepresentation occurred in and around the 1991 contract. Count VI states Defendants interfered with advantageous business relationships or expectancies between WADL and advertisers and viewers.

On June 29, 1993, Defendants removed the action to this Court on the ground that Counts I and II raised a federal question. On February 25, 1994, Plaintiff moved for partial summary judgment on the issue of whether Defendants violated 47 C.F.R. §§ 76.51–70. Defendants replied on March 14, and brought their own motion for summary judgment on all counts that same day. Plaintiff responded on March 28, and Defendant replied on April 7.

After reviewing the pleadings and after hearing oral argument on May 26, 1994, this Court is prepared to rule on the pending motions. This memorandum opinion and order sets forth that ruling.

## II. FACTUAL BACKGROUND

The following facts, unless otherwise indicated, have been stipulated to by the parties.

Plaintiff is a local television broadcasting station, also known as WADL–Channel 38. It operates out of Mt. Clemens, Michigan, and, at least prior to June of 1993, it primarily broadcast home-shopping programs.

Plaintiff has also been an "alternate affiliate" for CBS since 1990. As an alternate affiliate, it broadcasts CBS programming which the primary affiliate in the Metropolitan Detroit Area, WJBK–Channel 2, turns down. *See* Defendants' Response Brief, Ex. B (letter from CBS Affiliate Relations). WJBK is located in Southfield, Michigan.

Defendant Cablevision is a Delaware limited partnership with its place of business in Dearborn, Michigan. Defendant Clark is Cablevision's General Manager. Cablevision supplies exclusive cable services to the residents of Dearborn. One of the stations it broadcasts is WJBK.

In 1988, Mr. Franklin Adell, Plaintiff's president, wrote to Cablevision seeking its carriage of WADL in the Dearborn market. Mr. Adell continued his attempts to get WADL broadcast by Cablevision until February 20, 1991, when some sort of deal was struck. In its answers to interrogatories, Plaintiff asserted that:

> Mike Reynolds [Cablevision's General Manager in 1991] called Frank Adell and stated that he would put WADL on their cable television system, but would need a check for $2,500.00 for the equipment that is needed to put WADL on and that if this compensation was made, Plaintiff was to have a permanent position/location on Defendant's cable television system.

*See* Defendants' Brief, Ex. K, Plaintiff's Answer to Defendant's First Set of Interrogatories, Q. 18. *See also* Plaintiff's Complaint, Ex. F ($2,500.00 check from Plaintiff to Defendant bearing notation "Cable Equipment").

At his deposition, Mr. Adell gave the following testimony:

> Q. So I want to get this straight. You talked to [Mr. Reynolds] in February,

1991. He said we're going to put you on the air if you give us a check?

A. That is correct.

Q. You gave him a check?

A. That is correct.

Q. And then he put you on for a couple of days.

A. But I don't know when he put us on, what specific day he put us on, but it was only for a few days and a couple of hours of the day.

Q. But your knowledge on that last point; that is, that you were only carried for a couple days and for a couple hours a day comes exclusively from what Mr. Reynolds told you, right?

A. That is correct.

* * * * * *

Q. Did he tell you which hours a day he was carrying you?

A. He said late night.

Q. Wasn't it in fact your CBS programming?

A. I have no idea what time of the day it was but it was late night he said.

Q. Did he tell you that it was the late— that it was the CBS programming?

A. I don't recall.

Q. Okay. Didn't he in fact tell you that that was what they wanted to put on the air?

A. No, sir.

Q. Okay. When he told you that they would put you on the air what did you understand that to mean?

A. That it would be 24 hours a day.

Q. Seven days a week?

A. Seven days a week.

Q. Okay. What were the circumstances that caused him to—as you understand it why did you end up talking to him a couple of weeks later and he said, oh, we're not carrying you?

A. Because I asked him.

Q. You called him?

A. I believe. I was always in contact with him.

Q. When you called him did you know you weren't being carried?

A. He said we're not carrying you.

Q. Before you picked up the phone and called him did you know?

A. No.

See Plaintiff's Complaint, Ex. F; Defendants' Brief, Exs. B (Frank Adell Dep. 60–62).

Plaintiff, however, has conceded since Mr. Adell's deposition that Cablevision carried for some period of time WADL's late night CBS broadcasts. See Plaintiff's Response Brief, pp. 6–7 (stating that "there is no dispute the Defendant ceased carrying WADL's late night CBS programming earlier last year"). See also Joint Final Pretrial Order, p. 15 ("After February 20, 1991, Cablevision broadcast WADL's signal."). Plaintiff also may be retreating from its earlier position that the agreement was for permanent, full-time broadcasting. In its response brief, Plaintiff argued:

Defendant said it could not carry WADL full-time because it lacked available channel capacity—a problem which would be resolved. Defendant's position is that WADL was willing to accept part-time carriage pending availability of a full-time slot. It was a critical part of the agreement made between WADL and Defendant that carriage, neither part-time nor full-time, would arbitrarily and unilaterally be denied—not that the agreement was permanent. Ultimately, Defendant's determination to yank WADL off the air was arbitrary and capricious as well as violative, first of the agreement made between the parties and, second, of the must-carry requirements of the 1992 Cable Act.

Plaintiff's Response Brief, p. 8.

Cablevision, however, has consistently asserted that the February, 1991 agreement was only to use WADL as a part-time substitute for late-night CBS broadcasting not picked up by WJBK–Channel 2. Mr. Reynolds testified:

Q. At the time that you had this conversation [with Mr. Adell] and later accepted this check, did you ever tell

Mr. Adell that he would permanently be on the Dearborn system?

A. No, I did not.

Q. What did you do with the check when you received it?

A. I processed it, as per our normal processing procedures, which was to forward a check to our corporate office for deposit and ordered the equipment and commenced carriage for Channel 38.

Q. Would you have written anything on the—any documentation that went to New York about this check?

A. I would have jotted down a couple of notes on what the check was for and what it was to be used for and why we received it.

Q. And what would you have explained— or what did you explain to New York on those notes or jots?

A. That this was reimbursement for a new channel or broadcast affiliate in the area that was requesting to be carried and that they were paying for the equipment to put them on.

Q. The reimbursement meaning to cover the cost of the equipment?

A. To cover the cost of the equipment, yes.

Q. In exchange for your agreement that you could use them for network substitution programming.

A. That's correct.

Q. Did you in fact cause WADL to be on the cable system in Dearborn?

A. Yes.

Q. Part-time or full-time?

A. It was only during those non-network times so it was a part-time basis.

Q. By the way, did you carry all of the non-network—well, let me say this a different way. There are different times of the day when WJBK declined to carry CBS coverage, programming?

A. That would have been correct, yes.

Q. And sometimes WADL would have picked that up; sometimes it did not?

A. That's correct.

Defendants' Brief, Ex. J (Reynolds Dep. 34–35.)

Finding that there was some broadcasting of WADL on Cablevision, but being uncertain as to when this broadcasting occurred, the Court contacted Defendants' counsel just prior to the hearing to answer the question when, if ever, Cablevision stopped its broadcasting of WADL. Counsel's "best guess," after talking to his clients, was sometime between April and June, 1992. At this point, his letter states, a switch used to get WADL (which was not part of the purchased equipment) failed. No one bothered to repair it, he states, because it had no real significance to Cablevision and because Plaintiff did not complain. *See* May 23, 1994 letter from Thomas J. Tallerico, Esq. (copied to Plaintiff's counsel). These assertions went uncontested when reoffered by Defendants' counsel at the hearing on their motion.

From February/March, 1991, to April 9, 1993, the parties had no relevant contact with one another that has made it into the record. In that interim, Congress passed the Cable Television Consumer Protection and Competition Act of 1992. The Act was passed with the following policies in mind:

It is the policy of the Congress in this Act to:

(1) promote the availability to the public of a diversity of views and information through cable television and other video distribution media;

(2) rely on the marketplace, to the maximum extent feasible, to achieve that availability;

(3) ensure that cable operators continue to expand, where economically justified, their capacity and the programs offered over their cable systems;

(4) where cable television systems are not subject to effective competition, ensure that consumer interests are protected in receipt of cable service; and

(5) ensure that cable television operators do not have undue market power vis-a-vis video programmers and consumers.

*See* 1992 Cable Act, § 2, 106 Stat. 1460, 1463, *reprinted in* 1992 U.S.C.C.A.N., vol. 1.

Included in that act were the following provisions:

(a) Carriage obligations

Each cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations . . . as provided by this section. Carriage of additional broadcast television signals on such system shall be at the discretion of such operator, subject to section 325(b) of this title.

(b) Signals required

(1) In general

\*     \*     \*     \*     \*     \*

(B) A cable operator of a cable system with more than 12 usable activated channels shall carry the signals of local commercial television stations up to a third of its aggregate number of usable activated channels of such system.

\*     \*     \*     \*     \*     \*

(5) Duplication not required

Notwithstanding paragraph (1), a cable operator shall not be required to carry the signal of any local commercial television station that substantially duplicates the signal of another local commercial station which is carried on its cable system, or to carry the signals of more than one local commercial television station affiliated with a particular broadcast network (as such term is defined by regulation). . . .

47 U.S.C. § 534.[1]

Regulations promulgated by the FCC expand upon these statutory duties:

Effective June 2, 1993, a cable television system shall carry local commercial broadcast television stations in accordance with the following provisions:

\*     \*     \*     \*     \*     \*

(2) A cable television system with more than 12 usable activated channels, as defined in § 76.5(oo), shall carry local commercial television stations up to one-third of the aggregate number of usable activated channels of such system.

\*     \*     \*     \*     \*     \*

(5) A cable operator is not required to carry the signal of any local commercial television station that substantially duplicates the signal of another local commercial television station that is carried on its cable system, or to carry the signals of more than one local commercial television station affiliated with a particular broadcast network, as defined in § 76.55(f). However, if a cable operator declines to carry duplicating signals, such cable operator shall carry the station whose community of license reference point, as defined in § 76.53, is closest to the principal headend of the cable system. . . .

In light of this new law, on April 9, 1993, Washington counsel for WADL, William D. Silva, wrote to Cablevision and stated:

I am writing you on behalf of Channel 38, Station WADL–TV, Detroit ADI. As you may know, under the 1992 Cable Act, as recently implemented by the Federal Communications Commission, cable operators are required to carry local commercial television stations such as Station WADL–TV.

These must-carry rules will take effect shortly. By June 2, 1993, cable systems

---

1. The statute also provides:

(g) Sales presentations and program length commercials

(1) Carriage pending proceeding

Pending the outcome of the proceeding under paragraph (2), nothing in this chapter shall require a cable operator to carry on any tier, or prohibit a cable operator from carrying on any tier, the signal of any commercial television station or video programming service that is predominantly utilized for the transmission of sales presentations or program length commercials.

(2) Proceeding concerning certain stations Within 270 days after October 5, 1992, the Commission, notwithstanding prior proceedings to determine whether broadcast television stations that are predominantly utilized for the transmission of sales presentations or program length commercials are serving the public interest, convenience and necessity, shall complete a proceeding in accordance with this paragraph to determine whether broadcast television stations that are predominantly utilized for the transmissions of sales presentations or program length commercials are serving the public interest, convenience and necessity. . . .

47 U.S.C. § 534(g).

must begin carriage of their must-carry complement of signals. In addition, by June 17, 1993, local television stations will be required to make their initial election of must-carry or retransmission consent status. This is to advise you that Station WADL–TV intends to elect the must-carry provisions of the rules without compensation and further advises that its preferred channel position is Channel 38.

This is also to advise you that Station WADL–TV is fully entitled to must-carry status. In this connection, its programming has been reviewed and fully complies with the interim definition of stations whose programming is not predominantly utilized for the transmission of sales presentations or program length commercials.

Plaintiff's Complaint, Ex. B.

Mr. Silva wrote again to Cablevision, specifically, Lew Scharfberg, Cablevision's Director of Programming, on May 7, 1993:

Enclosed is a program schedule for Station WADL–TV effective June 1, 1993. As you will see, the station will operate 24 hours per day, seven days a week for a total of 168 hours per week and its home shopping programming totals less than half of its schedule. Accordingly, Station WADL–TV is entitled to carriage over your system.

Under the FCC's must-carry rules, you are obligated to commence carriage of the station by June 2, 1993. Any failure to comply with these rules will cause the station substantial loss of revenue for which the station intends to hold you responsible. In addition, it is the station's intention to invoke the FCC's special relief and must-carry complaint procedures set forth in 47 C.F.R. § 76.7.

Plaintiff's Complaint, Ex. C. A copy of this letter was sent to Defendant Clark. *Id.*

On May 24, Mr. Scharfberg responded to Mr. Silva on behalf of Cablevision. He wrote:

I am in receipt of your recent letter which included a program schedule for WADL. As you pointed out, this schedule is not currently in effect, but will be on June 1. Accordingly, after June 1 we will monitor

WADL to ensure that it complies with the Must Carry Rules in regard to program length commercials.

If WADL meets all criteria to be entitled to Must Carry status, CVI will comply with the FCC's Must Carry Rules.

Plaintiff's Brief, Ex. E.

Mr. Adell then personally delivered a letter to Defendant Clark, dated June 1, 1993, reiterating Plaintiff's position that Cablevision should begin carriage of WADL on June 2, and that failure to do so would result in (1) use of FCC complaint procedures, and (2) extensive damages to Plaintiff for which Plaintiff would hold Cablevision responsible. Plaintiff's Complaint, Ex. C.

Defendants did not begin carriage of WADL on June 2, 1993, and Plaintiff took two courses of action. First, it filed this case in state court on June 8. It also filed a complaint with the FCC in Washington, D.C., on June 15.

On November 24, 1993, the Chief of the FCC's Mass Media Bureau, Roy J. Stewart, issued a memorandum opinion and order mandating that Cablevision commence carriage of WADL within 46 days of entry of his order. Defendants' Brief, Ex. A. Chief Stewart concluded that WADL fell within the statutory class of stations that Cablevision must carry for two reasons. First, WADL's home shopping programming was not a bar to carriage because the FCC recently decided, pursuant to 47 U.S.C. § 534(g), that such programming serves the public interest.[2] Second, Cablevision's attempts to define WADL as a CBS affiliate that need not be carried under § 534(b)(5) and 47 C.F.R. § 76.56(b)(5) failed because WADL did not meet the statutory definition of a network affiliate. *Id.* Defendant complied with this order beginning January 9, 1994, but it has also appealed it to the full Commission. *See* Defendants' Response Brief, Ex. B.

Plaintiff claims that Defendants' failure to abide by the 1991 contract and by the duties under the 1992 Cable Act has cost it extensive damages in terms of lost programming. The parties agree that the Dearborn Real

2. *See* 8 FCC Rcd 5321, 1993 FCC LEXIS 4749, *48–49 (July 2, 1993).

Estate Show stopped its broadcasts sometime in 1991. *See* Defendants' Brief, Ex. B (Adell Dep. 34).[3] Similarly, the Zola Levitt Religious News Show, which, according to Mr. Adell, has a number of viewers of Middle Eastern descent,[4] cancelled its broadcasts in February, 1992. *Id.* at 40. Plaintiff also complains that it was never able to get the Arab Voice Detroit program because of WADL's lack of access to the Dearborn market. Plaintiff, however, did not offer any real evidence to corroborate Mr. Adell's contention that he even solicited this program, let alone that his request was denied because WADL was not broadcast in Dearborn. *Id.* at 42.

Pursuant to a stipulated order dated February 7, 1994, Plaintiff may not introduce any additional documentary evidence of damages or any new damage theory that was not supplied to Defendant prior to February 11, 1994. *See* Defendants' Brief, Ex. I. Another stipulated order dated March 8, 1994, precluded Plaintiff from using expert damage testimony at trial. *Id.* Thus the record on damages for this action is complete.

## III. *ANALYSIS*

### A. *THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish

---

3. It appears from the record that this program was also known as "Bob Allison's Home Buyer's Showcase." *See* Defendants' Motion in Limine to Exclude Additional Evidence of Damages, p. 2 n. 1. The last payment to WADL for this program that is part of this record is dated September 14, 1990. Defendants' Brief, Ex. K.

4. Dearborn, Michigan, has a very sizable Arab–American population.

5. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure,* § 2727, at 35 (Supp.1994).

that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding the cross-motions for summary judgment.

### B. *COUNTS I & II MUST BE DISMISSED.*

Defendants argue that the 1992 Cable Act and the regulations promulgated in its name do not establish, expressly or implicitly, a private cause of action. Plaintiff counters that the legislation does implicitly mandate the availability of private court suits.

■ The Court believes that Defendants have the stronger argument. The statute itself sets up the following exclusive remedial scheme:

(d) Remedies

(1) Complaints by broadcast stations

Whenever a local commercial television station believes that a cable operator failed to meet its obligations under this section, such station shall notify the operator, in writing, of the alleged failure and identify its reasons for believing that the cable operator is obligated to carry the signal of such station or has otherwise failed to comply with the ... other requirements of this section. The cable operator shall, within 30 days of such written notification, respond in writing to such notification and either commence to carry the signal of such station in accordance with the terms requested or state its reasons for believing that it is not obligated to carry such signal or is in compliance with ... other

requirements of this section. A local commercial television station that is denied carriage ... in accordance with this section by a cable operator may obtain review of such denial by filing a complaint with the Commission. Such complaint shall allege the manner in which such cable operator has failed to meet its obligations and the basis for such allegations.

(2) Opportunity to respond

The Commission shall afford such cable operator an opportunity to present data and arguments to establish that there has been no failure to meet its obligations under this section.

(3) Remedial actions; dismissal

Within 120 days after the date a complaint is filed, the Commission shall determine whether the cable operator has met its obligations under this section. If the Commission determines that the cable operator has failed to meet such obligations, the Commission shall order the cable operator ... to commence carriage of the station and to continue such carriage for at least 12 months. If the Commission determines that the cable operator has fully met the requirements of this section, it shall dismiss the complaint.

47 U.S.C. § 534(d). Final orders of the Commission are appealable to U.S. Courts of Appeal pursuant to 28 U.S.C. § 2342 and 47 U.S.C. § 402.

The legislative history of the 1992 Cable Act does not indicate any retreat from the exclusivity of this remedial scheme:

*Subsection (d) sets forth the procedures to be followed when a cable system fails to meet the obligations imposed in this section and the remedies for such failure. If a local commercial television station believes that a cable system is not in compliance with this section ... with respect to carriage ... it must so notify the cable system in writing. Within 30 days of being notified, the cable system must either rectify the non-compliance or explain in writing why it believes that it has complied with the requirements in this section. A*

television station may seek review of any such response by filing a complaint with the FCC. The FCC must provide the cable system with an opportunity to respond to the complaint and to present data and arguments that it has not failed to meet its obligations. The FCC must issue a decision on the complaint within 120 days after it is filed.

If the FCC determines that a cable system has not met its obligations with respect to carriage ... of one or more local commercial television signals, it shall ... order ... the cable system to carry a signal for at least one year. *This subsection is not intended to deprive federal or state enforcement authorities, consumers, or other private parties of any rights or remedies which they may have under federal or state laws safeguarding competition or consumer interests; nor is it intended to deprive parties of any contractual remedies they may have under agreements between cable operators and stations.*

H.R.Conf.Rep. 862, 102d Cong., 2d Sess. 68–69 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1231, 1250–51 (emphasis added).

A reading of the statute and the legislative history reveals a clear Congressional intent to establish an administrative remedy for the new federal must-carry right, while preserving *other* rights and remedies interested parties may have in the cable field. Because the statute on its face sets up a purely administrative remedy for a violation of the must-carry requirement, and because the legislative history does not indicate any hedging in Congress' careful selection of this exclusive remedy, this Court holds that no private cause of action to enforce § 534(a) in U.S. District Court exists.

The Court draws support for its conclusion from Supreme Court cases which have considered whether an implied private cause of action existed in various federal regulatory schemes. In *Cort v. Ash,* 422 U.S. 66, 84–85, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1975), the Court held that there was no implicit private cause of action for a shareholder against a corporation for its alleged violation of a federal criminal statute barring corporate expenditures on behalf of campaigns for the presidency of the United States. The Court came to this conclusion after carefully balancing the following factors:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? ...

422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original; citations omitted).

■ Applying this test to the 1992 Cable Act, the Court finds that local commercial television stations like WADL were intended beneficiaries of the Act and that the must-carry requirement is solely a creation of federal law. Nevertheless, even though creating a private right of action in stations like WADL would further the goal of the statute to "ensure that cable television operators do not have undue market power vis-a-vis video programmers," the Court believes that Congress clearly indicated its intent to have a strictly administrative remedy for breach of the must-carry provision. In the final analysis, it is Congress' intent that is the most salient factor in determining if a private cause of action for damages exists. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) ("our task is limited solely to determining whether Congress intended to create the private right of action asserted....") (holding that no private damage action lay for failure of auditor to pick up irregularities on brokerage firm's reports submitted pursuant to Securities and Exchange Act of 1934).

After extensive hearings and conferences, Congress carefully and deliberately chose a detailed administrative remedy for violations of § 534(a)'s must-carry mandate. A local television station must complain in writing to

an allegedly breaching cable system and give it 30 days in which to respond. After that time has passed, the local television station is free to appeal to the FCC, which must decide the matter within 120 days of the filing of the complaint. If the FCC orders carriage, the cable system has 45 days in which to comply. *See* § 534(d); 47 C.F.R. § 76.61. That this remedial scheme works and works quickly is evidenced by this record. Plaintiff received full-time carriage by Cablevision by January 9, 1994, within seven months of its June 15, 1993 administrative complaint.

Given the clear choice that Congress made in favor of an administrative remedy for breach of the must-carry provision, it is simply not this Court's appropriate role to create a private cause of action which can be brought directly in U.S. District Court. As pointed out in the *Touche Ross & Co.* decision, "when Congress wished to provide a private . . . remedy, it knew how to do so and did so expressly." 442 U.S. at 572, 99 S.Ct. at 2487. This it did not do here, and the Court will not do so either.

Because Counts I and II of Plaintiff's complaint ask for private enforcement of the 1992 Cable Act, they are dismissed.[6]

### C. *COUNT III MUST BE DISMISSED.*

■ This Count, which Plaintiff did not bother to defend in its response to Defendants' motion for summary judgment, alleges that Defendants were negligent in their performance of the must-carry requirement of the 1992 Cable Act.[7] As noted above, Congress created the uniquely federal must-carry right, and it established the exclusive administrative means of enforcing it. This Court cannot allow Plaintiff, then, to bring in through the back door of state law negligence what the Court has already thrown out the front window, namely, the notion that there should be a private cause of action to enforce the must-carry provisions in the 1992 Cable Act. This Count, therefore, must be dismissed.

### D. *COUNT IV MUST BE DISMISSED.*

The Court also believes that Plaintiff's claim for breach of contract arising from the 1991 "agreement" between the parties should be dismissed, although not for the main reason asserted by Defendants.

#### 1. *The Statute Of Frauds Is No Bar To Plaintiff's Claim.*

■ Defendants used much of their brief arguing to the Court that Plaintiff's claim should be barred because of the statute of frauds. M.C.L. § 566.132. That statute states (with a slight rearrangement of clause order by the Court) that "[e]very agreement that, by its terms, is not to be performed in 1 year from the making thereof . . . shall be void, unless such agreement, contract, or promise, or some note or memorandum thereof be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized. . . ." Defendants assert that the "agreement" that Plaintiff argues was made—that Cablevision permanently carry WADL in return for the $2,500 check for equipment—could not be performed in a year and that the check is an insufficient writing to get the agreement outside of the statute of frauds.

■ This Court disagrees on both points. Cases more recent than the ones cited by Defendants have made the statute of frauds a less formidable defense to certain contract claims. First, it is now well-settled that "a contract for an indefinite term has traditionally been considered capable of performance within the first year." *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 473 N.W.2d 652, 658 (1991) (Riley, J., writing for three-member plurality and agreeing with dissenting Justice Levin's analysis on this point). Absent evidence that the promise can in no way be performed in a year, an indefinite commitment will fall outside the statute of frauds. *See Dumas*, 437 Mich. 521, 473 N.W.2d at 658 (Riley, J.) (holding statute of frauds barred suit "to enforce agreements encom-

---

6. As a result of this ruling, Plaintiff's motion for partial summary judgment is now moot.

7. To the extent Plaintiff claims that Defendants negligently breached any alleged contracts with Plaintiff, it is hornbook law that the proper remedy for such a claim is in contract, not in tort.

passing promised renewal commissions which could not accrue until more than one year from the time of the agreements.").

Here, the promise to put WADL on the air permanently full-time or part-time could have been performed within a year, just as a promise to permanently employ a person can be performed within a year. In the same way a person may expire or quit prior to completion of a year, and, thus, fully complete the applicable contract, so may a television station stop operating or withdraw from the agreement—for whatever reason—within a year, and thereby fully complete an oral, permanent broadcasting agreement such as the one in this case. The Court, therefore, does not find the one-year hurdle a very difficult one for Plaintiff to overcome.

▮ Even if this Court were to hold that the statute of frauds did apply because the alleged contract could not be performed within the year, the Court is satisfied that the $2,500 check written by Plaintiff and cashed by Defendant is a sufficient written record of an agreement to satisfy the statute's demands. Although Defendant cited a number of (somewhat dated) cases in support of its position, the Court chooses to rely instead on then Justice Ryan's decision in *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 320 N.W.2d 836 (1982). In that case, the Michigan Supreme Court upheld against a statute of frauds attack a memorandum of understanding which preceded a planned—but ultimately unachieved—final contract. Justice Ryan wrote:

> We decline to accept the defendants' invitation to adopt narrow and rigid rules for compliance with the statute of frauds. Instead, we affirm the standard espoused by Professor Corbin and adopted by this Court in *Goslin v. Goslin*, [369 Mich. 372, 120 N.W.2d 242, 244 (1963)]:
>
> > " 'Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine: There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence.

> > *Some note or memorandum having substantial probative value in establishing the contract must exist;* but its insufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found. * * * That is the rule of law to be applied with intelligence and discrimination and not like a pendant playing a game of logomachy.' "

413 Mich. 354, 320 N.W.2d at 841–42 (emphasis added).

Given this test, and the language of the applicable statute of frauds, the Court is convinced that the $2,500 check endorsed and deposited by Cablevision is a sufficient writing to bind it to some sort of agreement with Plaintiff. It cannot be contested that there was at least an agreement for part-time, selective broadcasting of WADL; otherwise, the admitted expenditure for, and installation of, "cable equipment" that the check went towards would have been unnecessary. These facts, then, make it impossible for the Court to hold that the statute of frauds bars Plaintiff's claim.

## 2. *The Contract That The Parties Entered Into Was For Partial Coverage.*

Now that the Court has held that there was some sort of agreement between the parties, its next task is to determine the scope of that agreement and whether it was breached.

▮ Performance is often an excellent guide to intent, and it is really all one has to go by here. To fulfill their agreement, Plaintiff paid Defendant $2,500 to cover the cost of receiving equipment. Defendant purchased the equipment, installed it, and used it to pick up some of WADL's late-night programming through CBS, programming that was not transmitted by WJBK. These broadcasts occurred from February, 1991 until April to June of 1992, at which point a mechanical malfunction shut off the possibility of any further transmissions. Neither Plaintiff nor Defendant did anything about it, and may not even have noticed it. Plaintiff never made any attempts to monitor or expand its carriage by Cablevision until its "must-carry"

letters in 1993. These letters, the Court should add, made absolutely no mention of the 1991 agreement.

The facts in the record, then, demonstrate to the Court that no reasonable jury would find that the parties agreed to 24–hour, 7–days–a–week carriage of WADL on Cablevision. Rather, the parties agreed to indefinitely permit Cablevision to pick up WADL those occasional times each week that it could not get CBS late-night broadcasting on WJBK. Cablevision, thus, would have CBS programming for its viewers whenever it wanted it, and WADL would have additional viewers for those times. This agreement is the only way the Court can reconcile the check with both parties' completely lackadaisical approach to WADL's carriage on Cablevision.

Given this agreement, there is no evidence that any of Plaintiff's so-called damages were the result of a breach of contract. The agreement did not envision WADL broadcasts of anything other than late-night CBS programming, not the kind of shows upon which Plaintiff claims losses.

■ Even assuming, *arguendo*, that the record did not permit the Court to reach the above conclusion on what the parties actually contracted to do, it still believes that there is no way for Plaintiff to prove the damages it claims. Defendants correctly point out that

Plaintiff was under a duty mitigate its losses by informing Cablevision that any breach of the 1991 agreement was causing Plaintiff damages. *See Oakland Metal Stamping Co. v. Forest Indus., Inc.*, 352 Mich. 119, 89 N.W.2d 503, 506 (1958) (duty to mitigate commercial damages not met when plaintiff failed to discover defects in first shipments of parts and cancel further shipments until defects were fixed). The fact that there is no evidence of record that Plaintiff ever protested not being on Cablevision, then, has import beyond the fact that it lends further credence to the limited scope of its agreement with Cablevision, and that any breach thereof was of no interest to Plaintiff. By not investigating Cablevision's compliance and informing Cablevision that it was losing customers due to the alleged breach, Plaintiff failed to fulfill its duty to mitigate damages. Therefore, the losses stemming from the alleged breach should not fall upon Defendants.[8]

■ For these reasons, then, the Court does not believe that there are any material questions of fact remaining on this count that would permit Plaintiff to prevail at a trial.[9] Summary judgment of this count, therefore, is appropriate.

### E. *COUNT V MUST BE DISMISSED.*

Turning now to Count V, it alleges that Defendant Cablevision, through its agents, is

8. Plaintiff's counsel argued at the hearing that his client's managers did not protest the lack of carriage by Cablevision because they did not want WADL blacklisted by local cable companies. Even assuming that this is true, the Court does not find it a sufficient reason to permit this action to go forward. If Plaintiff did not want to "rock the boat" by challenging Cablevision's alleged breach, and thereby acquiesced in that breach, it should be estopped from recovering damages for the period of its acquiescence. *See Thompson v. Enz*, 385 Mich. 103, 188 N.W.2d 579, 581 (1971) (holding that plaintiffs were estopped from enjoining development project after it was well underway because they had full notice of it before the project even started).

9. To the extent that Plaintiff argues that the May 24, 1993 letter from Cablevision to Plaintiff created an additional contractual right, the Court is unpersuaded. The letter clearly states that Cablevision would condition its carriage of WADL on that station's complicity with having a minority home-shopping schedule. Under § 534(g),

quoted *supra*, Cablevision was free at the time it wrote the letter to refuse the carriage of majority home shopping program stations—which WADL admittedly was until June 2, 1993. Thus, there was nothing close to a promise of coverage in the letter.

Furthermore, even if the Court should read as some sort of promise the statement in that letter that "[i]f WADL meets all criteria to be entitled to must-carry status, CVI will comply with the FCC's must-carry rules," it is not a legally enforceable promise in contract law. It is well-settled that a pre-existing legal duty is insufficient consideration to support a valid contract. *See, e.g., Borg–Warner Acceptance Corp. v. Department of State*, 433 Mich. 16, 444 N.W.2d 786, 788 (1989) (lender sued Secretary of State for alleged breach of contract arising from payment of fee to have state office do a lien search; state office was under statutory duty to perform task, so there was no consideration). Thus, in no way can the May 24, 1993 letter be construed to create an additional contractual right in Plaintiff.

guilty of misrepresentation at the time of the 1991 contract formation and in its May 24, 1993 letter when it stated that it would comply with the FCC must-carry rules. Once again Plaintiff failed to defend this count in its summary judgment response, and the following analysis will show that it is little surprise why.

■ With respect to the 1991 contract, Defendants correctly point out that in general, "[f]ailure to carry out a promise to do a future act does not constitute actionable fraud; instead, the remedy, if any, lies in a suit for breach of contract." *Michigan Nat'l Bank v. Holland–Dozier–Holland Sound Studios,* 73 Mich.App. 12, 250 N.W.2d 532, 535 (1976). Plaintiff here is suing on Cablevision's failure to make good on its alleged promise to carry WADL full-time starting in February, 1991, so this rule applies to presumptively bar Plaintiff's fraud claim.

The only relevant exception to this rule is that "fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Hi–Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (1976). *Hi–Way Motor Co.* further stated that "evidence of fraudulent intent, to come within the exception, must relate to conduct of the actor 'at the very time of making the representations, or almost immediately thereafter.' " 398 Mich. 330, 247 N.W.2d at 817.

In this case, as noted above, Cablevision complied with the terms of the agreement that the Court has found for over a year. Thus, there is no evidence that it committed any intentional fraud under this exception, or otherwise, at the time of contracting. Even assuming, *arguendo,* that there was a contract for full-time carriage, the Court sees no evidence, other than non-compliance, to suggest bad faith. Absent additional evidence, the Court does not believe that the Plaintiff has created a material question of fact—with evidence suggesting the "clear and convincing" proof necessary in a fraud claim—on whether Cablevision acted in bad faith when it entered into the 1991 agreement with Plaintiff.

■ As for the events of 1993, Plaintiff has similarly failed to make out essential elements of fraud; this time, that a material misrepresentation was made on which the suing party reasonably relied. *See U.S. Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 82–85 (1981). Cablevision stated in its May 24, 1993 letter that "if WADL meets all criteria to be entitled to must-carry status, CVI will comply with the FCC's must-carry rules." This letter, then, clearly put Plaintiff on notice that Cablevision was contesting Plaintiff's assertion that WADL met these requirements. Cablevision has continued its resistance to carrying WADL to the present. Because the letter accurately reflected Cablevision's resistance to putting WADL on the air, then, it simply did not contain a material misrepresentation of fact.

■ Perhaps even more significantly, there is no question that Plaintiff did not rely on the statements in the letter in any way. Within four weeks, it had fired back at least one threatening letter and had initiated lawsuits in two different venues. This is hardly detrimental reliance, especially considering the fact that by this time two of the three shows that Plaintiff claims to have lost made their last WADL broadcast at least a year before, and this Court has no hard evidence regarding solicitation of business with the third (Arab Voice). In light of these facts, the Court cannot find that Plaintiff's misrepresentation claim can survive summary judgment.

## F. *COUNT VI MUST BE DISMISSED.*

■ Plaintiff's final count for tortious interference with a business relationship or expectancy can also be easily dismissed. The Michigan Court of Appeals has developed the test for tortious interference with business relationships which this Court will apply:

> We hold that one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the con-

tractual rights or business relationship of another.

*Feldman v. Green*, 138 Mich.App. 360, 360 N.W.2d 881, 891 (1984). *Accord Formall, Inc. v. Community Nat'l Bank*, 166 Mich. App. 772, 421 N.W.2d 289, 292–93 (1988) (adding that "a *per se* wrongful act is an act that is inherently wrongful or one that is never justified under any circumstances"). It follows that to survive summary judgment, Plaintiff must come forward with evidence creating a material issue of fact on the issues of whether Defendants acted in an outrageously wrongful way and with the intent to undermine Plaintiff's business.

Plaintiff has failed to meet this burden. The most that Defendant can be said to have done is to breach a 1991 agreement with Plaintiff to indefinitely carry WADL full-time until it in fact began full carriage in January, 1994. There is no showing that this act was per se wrongful, let alone done with the any kind of intent to undermine WADL's business relationships or expectancies. In light of the complete absence of any factual support for this claim—or legal argument, for that matter—this Court must dismiss this count as well.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment is DENIED as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.